# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, *ex rel.* JASON GASKIN, <br><br> Plaintiffs, <br><br> vs. <br><br> FIRST CALL AMBULANCE SERVICE, LLC <br><br> Defendant | Civil Action No. <br><br><br> **FILED UNDER SEAL** <br> **Pursuant to 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

*Qui tam* relator Jason Gaskin ("Gaskin" or "Relator"), brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and the Tennessee Medicaid False Claims Act ("TMFCA") Tenn. Code § 71-5-182 *et seq.*, on behalf of the United States of America and the State of Tennessee against Defendant First Call Ambulance, LLC ("Defendant" or "First Call"). Relator's allegations are based upon his own knowledge and upon an investigation undertaken by him through counsel. Relator alleges as follows:

### I. NATURE OF THE CASE

1. This *qui tam* action is an effort to restore to the United States and the State of Tennessee millions of dollars Defendant has taken through a systemic and longstanding fraud, perpetrated through the Medicare and Medicaid programs.

2. Ambulance transport is only covered by Medicare or Medicaid where it is "medically necessary" as defined by the relevant regulations. At all relevant times, Defendant

engaged in a fraudulent scheme to bill Medicare and Medicaid for ambulance transport that was not medically necessary, by submitting claims for payment for ambulance services which failed to qualify as such. The fraud alleged herein began over ten years ago, and continues to this day.

## II. PARTIES

3. Defendant First Call Ambulance, LLC is a Tennessee corporation with its headquarters and principle place of business at 1877 Air Lane Drive, Nashville Tennessee. First Call operates ambulance services both in Nashville and through branch offices it maintains in Clarksville, Columbia, Dickson, Knoxville, La Vergne, Memphis, and Springfield Tennessee, as well as in Southaven, Mississippi.

4. Relator Jason Gaskin is a natural person residing in the state of Tennessee. Mr. Gaskin was an EMT employed by First Call from April 12, 2011 to on or about December 30, 2011.

5. The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein -- Medicare claims in full and Medicaid claims in part -- and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

6. The State of Tennessee is a real party in interest under the TMFCA and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

## III. JURISDICTION AND VENUE

7. Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA, and the State of Tennessee under the TMFCA.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the count asserted under state law pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

9. This Court has personal jurisdiction over Defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendant is headquartered, transacts business, and committed violations of 31 U.S.C. § 3729 in this District.

10. This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A) and Tenn. Code Ann. § 71-5-183 (e)(2)(A).

11. To the extent there has been a public disclosure unknown to Relator, he is an original source under all relevant statutory provisions. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which his allegations are based and/or has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

### IV. RELEVANT STATUTES AND REGULATIONS

#### A. THE FALSE CLAIMS ACT

12. The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United

States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

13. The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

14. The FCA also imposes liability on any person who conspires to commit false claims or false statements ("conspiracy claim"). 31 U.S.C. § 3729(a)(1)(C).

### B. THE TENNESSEE MEDICAID FALSE CLAIMS ACT

15. The TMFCA makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment under the medicaid program. Tenn. Code § 71-5-182(a)(1) The TMFCA also prohibits knowingly making, using, or causing to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program paid or approved. *Id.* The TMFCA further prohibits conspiracies to defraud medicaid. *Id.* Finally, the TMFCA prohibits knowingly making, using, or causing to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to Medicaid. *Id.*

16. The TMFCA provides that a person acts "knowingly" if that person "acts in deliberate ignorance of", or "reckless disregard for" the truth or falsity of facts. Proof of specific intent to defraud is not required. Tenn. Code § 71-5-182(b).

## C. MEDICARE AND MEDICAID'S REQUIREMENT THAT AMBULANCE TRANSPORT BE "MEDICALLY NECESSARY" AND PROPERLY DOCUMENTED

17. Medicare and Medicaid both provide payment for transport by ambulance only where that transport is "medically necessary." *See* 42 CFR 410.40(d); 42 CFR 455.2 *et seq*. Medicare provides that ambulance transportation is medically necessary where "the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." 42 CFR 410.40.

18. Certain transports are more expensive than others. Among other criteria, the provision of Advanced Life Support ("ALS") services allows a provider to submit a significantly larger bill to Medicare than the provision of Basic Life Support ("BLS") services, because ALS services must be performed by EMT-Intermediates or by paramedics (collectively, "ALS Personnel"), who have higher levels of training than do the EMT-Basics who are able to provide BLS services.

19. Just as the provision of any service whatsoever must be medically necessary, the provision of ALS, as opposed to BLS, service must be justified. Medicare regulations provide that "[t]he beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary." 42 CFR 410.40.

20. Medicare further requires that any provision of ALS services must include an "ALS assessment." An ALS assessment is only medically necessary where "the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment." 42 CFR 414.605 ALS crews, in turn, are:

individual[s] trained to the level of the emergency medical technician-intermediate (EMT-Intermediate) or paramedic. The EMT-Intermediate is defined as an individual who is qualified, in accordance with State and local laws, as an EMT-Basic and who is also qualified in accordance with State and local laws to perform essential advanced techniques and to administer a limited number of medications. The EMT-Paramedic is defined as possessing the qualifications of the EMT-Intermediate and also, in accordance with State and local laws, as having enhanced skills that include being able to administer additional interventions and medications.*Id.*

21. Medicare's provider manual explicitly requires that ambulance providers maintain documentation showing the medical necessity of all transports. Specifically, Medicare's Benefit Policy Manual[1] ("Medicare Manual"), states:

> In all cases, the appropriate documentation must be kept on file and, upon request, presented to the carrier. It is important to note that neither the presence nor absence of a signed physician's order for an ambulance transport necessarily proves (or disproves) whether the transport was medically necessary. The ambulance service must meet all program coverage criteria in order for payment to be made.

Medicare Manual 10.2.4. Medicaid programs have similar requirements.

### D. COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT UNDER BOTH PROGRAMS

22. To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting documentation to Medicare.[2] Among other things, that form provides "additional requirements that [] supplier[s] must meet and maintain in order to bill the Medicare program." These requirements, which are pre-requisites to payment under Medicare, include a certification that: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this

---

[1] The Manual is available at http://www.cms.gov/manuals/Downloads/bp102c10.pdf (last accessed July 26, 2011).

[2] Form CMS-855B is accessible at http://www.cms.gov/CMSforms/downloads/cms855b.pdf (last accessed September 20, 2011).

supplier . . . *I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare."* CMS-855B, at 31 (emphasis added). The provider also certifies that "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.*

23. Similarly, Medicaid regulations require that all provider claim forms include the following statements near the provider's signature: "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 CFR 455.18

24. Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA and the TMFCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements. Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA and TMFCA.

## V. DEFENDANT'S FRAUDULENT CONDUCT

### A. BACKGROUND

25. In the medical transport business, the Emergency Medical Technicians ("EMTs") that accompany a vehicle fill out what is known colloquially as a "run report." These run reports include information such as the date, time, and location of an ambulance pick-up and drop-off, check boxes to describe various conditions that may typically affect an ambulance patient (for

DOCS\628970v1

Case 3:12-cv-00815   Document 1   Filed 08/08/12   Page 7 of 16 PageID #: 7

example a check box for "stroke" or "heart attack"), and a box for a "narrative." The narrative is simply the EMT's account of what happened during transport. An example narrative might read: "Arrived at scene to find 77 year old female supine in bed, displaying symptoms of cardiac arrest. Patient could not self-ambulate to vehicle, was strapped into stretcher, given oxygen, transported to hospital."

26.     At First Call, run reports are laid out such that there is a box in the top right hand corner labeled "Physical or Mental Reasons for Transport," in which EMTs are to document the reasons transport by ambulance was medically necessary for the patient.

27.     In addition, non-emergency, scheduled transport is documented by a Certificate of Medical Necessity ("CMN"). That document is to be filled out by the patient's physician (or, in some instances, a nurse). Like the run reports, the CMNs document, among other things, the medical necessity of transport by ambulance.

28.     Run reports and CMNs are not submitted to Medicare or Medicaid, but are required to be kept by the service provider for a period of five years in case Medicare or Medicaid requires more information regarding a particular transport.

### B. FALSIFICATION OF RUN REPORTS - GENERALLY

29.     During his tenure at First Call, Relator was often dispatched to transport patients to or from nursing homes or hospitals. Often, Relator and his partner would be confronted with a patient who plainly did not need to be transported by ambulance. Indeed, some patients were so ambulatory that they were able to walk to the vehicle and enter unassisted.

30.     Nevertheless, the nursing staff at the hospital or nursing home would check "non-ambulatory" on the CMN as a basis for transport by ambulance. On one such occasion during the summer of 2011, Relator recalls arriving at a nursing home to transport a male patient who

was using a wheel chair and could easily have been transported by wheelchair van. The patient himself stated "I don't know why I'm going by ambulance."

31. On occasions where the patient clearly did not need an ambulance, Relator, unable to ascertain any medical necessity for the transport, would leave the box labeled "Phyiscal or Mental Reasons for Transport" empty, because there were no such reasons. Relator was quickly reprimanded by his superiors, Jacob Downey, the General Manager of the Clarksville Station, and by Daniel Micynik, the ALS Coordinator. Downey and Micynik told Relator that he could not leave the box blank.

32. Relator, in an effort to comply with First Call's directives, then began entering "not medically necessary" in the box. Again, Relator was promptly called before management, where he was told he must find, and write down, a reason that ambulance transport was medically necessary. When Relator protested that in many instances transport by ambulance was unnecessary, Downey and Micinyk responded that Relator should simply "find" reasons by using the patient's medical history. By way of example, management stated that if a patient had, at some point in the past, suffered a congestive heart failure, then Relator should write "congestive heart failure" in the box.

33. Downey and Micynik reprimanded Relator for writing "not medically necessary" on run reports no less than three times.

### C. FALSIFICATION OF RUN REPORTS REGARDING DIALYSIS PATIENTS

34. Among other transports, First Call routinely transports patients to dialysis treatments. Such patients are particularly lucrative for First Call, because dialysis treatments typically occur three times each week, and each treatment involves a run both to and from the treatment center.

35. While some dialysis patients do require an ambulance, many do not. As with any other patient, the question is whether there is another means of transport that the patient can safely utilize.

36. Relator routinely transported dialysis patients that did not need to go by ambulance and could easily have used a wheelchair van. Relator estimates that nearly half of the dialysis patients transported by First Call do not need to be transported by ambulance.

37. Indeed, on one occasion in the fall of 2011, Relator entered a Shoney's restaurant with his partner, only to see one of his routine dialysis patients sitting in the restaurant with her husband -- she had traveled there with her husband, in his personal vehicle. Because the purported "necessity" of that patient's transport was predicated upon her being unable to safely sit in a wheelchair during transport, Relator immediately contacted the dispatcher at First Call, who instructed him to write a report on the incident. Relator's partner, Bradley Newman, wrote such a report, at which time Relator and Newman were told by Downey that First Call would "look into" the situation, but that in the mean time, pursuant to First Call's "protocols", Relator was to continue transporting the patient. As of the termination of Relator's employment, that patient was still being transported by ambulance.

### D. FALSIFICATION OF RUN REPORTS REGARDING HOSPITAL-TO-HOSPITAL TRANSFERS

38. In addition to the wrongdoing outlined above, Defendant has instituted a policy whereby all hospital to hospital transfers are to be treated as, and billed as, ALS transfers.

39. Specifically, EMTs routinely arrive at a hospital and receive a CMN that has been marked by a physician as necessitating only Basic Life Support. Basic Life Support does not include the use of a cardiac monitor. Nevertheless, *pursuant to First Call's policies, EMTs are*

*required to use the cardiac monitor in all facility to facility transports, and such transports are then to be billed as ALS.*

40.     Relator and his partner, a paramedic, complained to management about this practice as well. Specifically, the two stated that they wanted to follow the orders set forth by doctors on the CMNs, because "He is a doctor. He trumps us." Downey and Micynik replied that the doctor's orders were irrelevant, because the two were required to follow First Call's protocols.

### E.  CONTINUED FALSIFICATION OF REPORTS AND SUBMISSION OF FALSE CLAIMS BY DEFENDANT'S BILLING AND QUALITY ASSURANCE DEPARTMENTS

41.     At First Call, when an ambulance crew returns from their shift, they submit their run reports and CMNs to a "Quality Assurance" Department located at each office. That department reviews the run reports and CMNs, and passes those it approves on to the centralized billing department which is located at Defendant's headquarters in Nashville.

42.     Run reports that are not approved by the Quality Assurance department are returned to the relevant employee, and the employee is instructed to either complete missing information, or is counseled in the "proper" way to fill out run reports. *Any time a run report contains information that would indicate Medicare should not pay for the transport -- for example, by stating "not medically necessary" -- the Quality Assurance department returns the report to the EMT and instructs them not to include such information in the future.*

43.     Similarly, any time a run report contains information that contradicts a CMN, the Quality Assurance department will return the run report to the EMT or, in some instances, simply alter it themselves, so that it matches the CMN. *This occurs even on occasions where the CMN is plainly incorrect.* As set forth above, the staff at hospitals and nursing homes -- whose

only incentive is to get the patient out the door -- routinely filled out CMNs that claimed patients were qualified for ambulance transport when they were not.

44. Once run reports are approved and sent to the billing department, they are given a second review by First Call's staff there, who actually submit the claims to Medicare. Witnesses interviewed by Relator's counsel have confirmed that *employees in the billing department change run reports on a daily basis in order to ensure payment by Medicare.*

45. Specifically, individuals in the billing department would sometimes send people back to the various facilities around Tennessee to demand that certain paperwork be changed. Additionally, *where run reports indicated, either explicitly or implicitly, that transport was not medically necessary, individuals in the billing department would sometimes alter those descriptions themselves.* One former employee of the billing department that was interviewed by Relators' counsel recalled an incident where a run report reflected that a patient had walked into an ambulance. That employee was instructed to change the report to indicate that the patient was bed-confined.

46. *According to that same former employee, senior members of the billing department, Tracy Hanson (Business Office Supervisor) and Tina Hinton (Business Office Manager), acting on management's instructions, met each week with lower level billing employees to instruct them on how to submit claims to Medicare. Those instructions included an absolute prohibition on stating that patients could walk, because Medicare would not pay such claims.* This was despite the fact that paramedics and EMTs indicated that patients could walk on the run report or, in some cases, stated as much to the billing personnel. Billing employees who questioned this practice were reprimanded or fired. This witness estimated that *as much as*

*75 to 80 percent of the claims submitted to Medicare were altered to state that patients were bed confined or non-ambulatory when this was not the case.*

47. Relator does not know the exact size of the fraudulent scheme at issue. However, First Call has approximately 1,000 employees, and locations throughout the State of Tennessee, including in larger metropolitan areas like Nashville and Memphis. An investigation undertaken by Relator's counsel indicates that First Call has *annual revenues between $500 million and $1 billion.* As set forth above, at least one former employee believes that *as much as 80% of those revenues may be the ill-gotten gains of fraud.* First Call's fraud has gone on for years, and shows no signs of stopping.

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A) and (B)**

48. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint as if set forth herein at length.

49. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

50. As a result of the misconduct alleged herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

51. As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

52. The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

DOCS\628970v1
Case 3:12-cv-00815  Document 1  Filed 08/08/12  Page 13 of 16 PageID #: 13

53. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## TENNESEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code § 71-5-182 *et seq.*

54. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint as if set forth herein at length.

55. This is a claim for treble damages and civil penalties under the Tennesee Medicaid False Claims Act, brought pursuant to Tenn. Code § 71-5-183(b).

56. As alleged herein, Defendant violated Tenn. Code Ann. § 71-5-182(a) in at least the following respects:

   a. In violation of subparagraph (1) (A) Defendant presented, or caused to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent; and

   b. In violation of subparagraph (1)(B) Defendant made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false.

57. The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so.

58. By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator pray that judgment be entered against the Defendants, ordering that:

A. Defendant cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, et seq. and the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-182 *et seq.*;

B. Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

C. Defendant pay the State of Tennessee not less than $5,000 and not more than $25,000 for each violation of the Tennessee Medicaid False Claims Act, plus three times the amount of damages the State of Tennessee has sustained because of Defendants' misconduct;

D. Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 71-5-183 (d) (1);

E. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Tenn. Code Ann. § 71-5-183 (d) (1), and any other applicable law or regulation;

F. Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

G. The United States, the State Tennessee, and Relator be awarded such other, further or different relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Relator hereby demands trial by jury.

Respectfully submitted,

**PROVOST UMPHREY LAW FIRM LLP**


By: /s/Michael Hamilton

Michael Hamilton, Esq.
TN. BPR #010720
2021 Richard Jones Road, Suite 300
Nashville, Tennessee 37215
Tel: 615.242.0199
Fax: 615.256.5922
Email: mhamilton@provostumphrey.com

*Local Counsel for Plaintiff-Relator Jason Gaskin*


Brad N. Friedman, Esq.
Roland W. Riggs, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
Tel: 212.594.5300
Fax: 212.868.1229
Email: bfriedman@milberg.com
rriggs@milberg.com

*Lead Counsel for Plaintiff-Relator Jason Gaskin*

George Pressly, Esq.
**KYROS & PRESSLY LLP**
60 State Street, Suite 700
Boston, Massachusetts 02109
Tel: 603.320.7030
Email: gpressly@presslylaw.com

*Co-Counsel for Plaintiff-Relator Jason Gaskin*